IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

LUIS RODRIGUEZ,

        Plaintiff,

vs.                                      CASE NO. 1:13-cv-181-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for a period of disability, disability insurance benefits ("DIB"), and supplemental security income benefits. ("SSI".) (Doc. 1).   The Commissioner has answered (Doc. 15), and both parties have filed briefs outlining their respective positions. (Docs. 21 and 22.)  For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I.  PROCEDURAL HISTORY

The Court remanded a previous appeal stemming from denial of the same applications for further consideration and clarification regarding the identity of the doctor who signed a Medical Opinion Regarding the Ability to do Work-Related Activities (Mental) ("Assessment").   *See Rodriguez v. Comm'r, Social Security*, Case No. 1:09-cv-240-MP-GRJ.  As summarized in that case, Plaintiff filed applications for DIB and SSI on November 30, 2006, alleging a disability onset date of February 15, 2006 (R. 112, 116, 144) because of bipolar disorder and problems getting along with others. (R. 144.)

Plaintiff's applications were denied initially (R. 56-58, 59-61) and upon reconsideration. (R. 63-64, 65-67.)  Plaintiff requested a hearing before an administrative law judge (ALJ), who conducted hearings on October 20, 2008 (R. 41-47) and on January 5, 2009. (R. 25-40.)   On April 13, 2009, the ALJ issued an unfavorable decision. (R. 9-11.) The Appeals Council denied Plaintiff's request for review (R. 1-3).  On appeal, the Court concluded that a reversal and remand was necessary to determine whether Dr. Pait or Dr. Llinas signed the Assessment and, based upon the Assessment's author, give appropriate weight to the medical opinions expressed in the Assessment.  *See Rodriguez v. Comm'r, Social Security*, Case No. 1:09-cv-240-MP-GRJ.

On remand, a hearing before a different ALJ was conducted and the parties agreed that the Assessment was signed by Dr. Pait.  (Doc. 16-2, R. 330).  After the first hearing on remand, Plaintiff was referred for a consultative psychological examination. A second hearing was convened on May 28, 2013.  On June 19, 2013, the ALJ issued an unfavorable decision. (Doc. 16-2, R. 330-42.)   Specifically, the ALJ concluded that while Plaintiff has the severe impairments of bipolar disorder and borderline intellectual functioning, he does not have an impairment or combination of impairments that meets or medically equals the listings.  The ALJ concluded that Plaintiff retains the residual functional capacity to perform a full range of work at all exertional levels, with some nonexertional limitations.  *Id*.

The Appeals Council denied Plaintiff's request for review.  Doc. 16-2 (R. 1-5). The instant appeal followed.  Plaintiff raises one issue for review: whether substantial evidence supports the ALJ's decision that Plaintiff is not disabled pursuant to the listings for disability based on mental retardation.   Doc. 21.

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be

---

[1] *See* 42 U.S.C. § 405(g) (2000).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6]  The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[7]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[8]  The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[9]  The Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled.[10]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of

---

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[9] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[10] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

exertion."[11]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[12]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[13]  Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[14]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

## III.  SUMMARY OF THE RECORD

Plaintiff's personal, work, and medical history was summarized in the Court's original R&R.  The following citations are to the administrative record set forth in Doc. 16-1.

### A. Personal and Work History

Plaintiff was born on November 20, 1965, and was forty-three years old at the time of the hearing. (R. 25, 28.) He has past relevant work experience as a packer/receiver/stocker. (R. 166-73.)  Plaintiff reported he attended Eastern District

---

[11] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996). See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[12] Walker, 826 F.2d at 1003.

[13] Wolfe, 86 F.3d at 1077-78.

[14] See id.

High School in Brooklyn, New York but did not complete twelfth grade because he did not want to keep studying. (R. 28-29.) He reported he did not earn a GED. (R. 28). Plaintiff stated he could "more or less" read and write in English, but could not generally understand a newspaper article and sometimes had trouble understanding restaurant menus. (R. 29.) He reported he could read and write in Spanish. (R. 29).

Plaintiff worked a part-time job as a laundry presser beginning June 6, 2007. (R. 29-30, 121-22, 219-28.)  He reported working three to four hours a day, at nine dollars an hour, four days a week.  (R. 30-31.)  While Plaintiff is scheduled to work five days a week, he stated he does not go to work when he does not feel well. (R. 31.)  Plaintiff reported this is not a problem because the owner knows his condition and the owner is friends with his brother. (R. 31.). According to Plaintiff, he sometimes leaves work early because he has a temper and does not feel like talking to anyone. (R. 32.)

Plaintiff explained that he cannot do much because of drowsiness caused by medication.  (R. 62, 150-54.)  Additionally, Plaintiff reported he is limited with regard to lifting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, memory, completing tasks, concentration, understanding, following instructions, using hands, and getting along with others, because of drowsiness. (R. 155).  Plaintiff generally reported no significant side effects of his medications and being 100% medication compliant to his treating physicians at Meridian. (R. 306, 308.)

**B. Medical Records**

Plaintiff's records disclose that he was treated at Meridian from September 12, 2006 through October 8, 2008. On September 12, 2006, Plaintiff's first day of treatment, a psychiatric evaluation and a medication management appointment were

conducted. (R. 248-49, 254-57, 258-59.)  Plaintiff was diagnosed with bipolar disorder. (R. 257.).  Plaintiff's GAF score was sixty and his prognosis was fair. (R. 257.)  His psychiatric evaluation noted he was a married Puerto Rican male with "little or no English," and a history of depression, anxiety, mood swings, and irritability. (R. 254, 256.)  Plaintiff had poor appearance, appropriate manner, retarded motor behavior, grossly intact cognition, anxious mood, "ok" thought process, poor insight, and fair judgment. (R. 256.)

Plaintiff advised that he sought treatment at Meridian because he needed medication to control his nerves. (R. 254.)  He reported that he previously lived in New York and New Jersey and was treated by a psychiatrist there for two years. (R. 254.)  Plaintiff was not taking any medications at the time of this visit. He denied substance abuse, and admitted he smoked three packs of cigarettes a day for his nerves. (R. 255.)

On November 20, 2006, Plaintiff returned to Meridian for a medication management appointment. (R. 246-47, 252-53.)   Dr. Llinas noted Plaintiff had fair appearance, appropriate manner, normal motor behavior, grossly intact cognition, "ok" thought process, poor insight, and fair judgment. (R.247, 253.) It was noted that Plaintiff did not express homicidal or suicidal ideation. (R.247, 253.)  Plaintiff's progress was rated at seven out of ten. (R.247, 253.)

On December 15, 2006, Plaintiff met with Dr. Llinas for a medical management appointment. (R. 244, 250.)  Dr. Llinas noted Plaintiff had fair appearance, appropriate manner, normal motor behavior, grossly intact cognition, and no homicidal or suicidal ideation. (R. 245, 251).  His progress was rated as an eight out of ten. (R. 245, 251.)

On March 28, 2007, Plaintiff returned to Meridian for a medication management appointment and Treatment Plan Reassessment and Update. (R. 313-14, 321-22.) Plaintiff had fair appearance, appropriate manner, normal motor behavior, grossly intact cognition, no homicidal or suicidal ideation, and fair judgment and insight. (R. 314.)  His progress was nine out of ten. (R. 314.)  Plaintiff reported no side effects from medication, although he reported he was still depressed and had mood swings "all the time." (R. 321.)  He further reported that his sleep was poor while taking Zyprexa; thinking about hurting himself daily (crashing the car into a wall); talking to himself; and hearing threatening auditory hallucinations. (R. 321.) At this visit, it was noted that Plaintiff was directed to begin taking Abilify as he was tapered off Zyprexa. (R. 321.) Plaintiff's behavior and symptoms were listed as "depressed mood, mood wings, irritability, insomnia [with] meds." (R. 321.)  His GAF score was 60. (R. 321.)

On April 25, 2007, Plaintiff returned to Meridian for a medication management appointment. (R. 311-12.) He had fair appearance, appropriate manner, normal motor behavior, and grossly intact cognition.  (R. 312.)  Plaintiff's progress was noted as nine out of ten.  (R. 312.)

On May 25, 2007, Plaintiff returned to Meridian for a medication management appointment. (R. 309-10.)  Plaintiff had good appearance, appropriate manner, normal motor behavior, grossly intact cognition, stable but anxious mood, restricted affect, paranoid thought process, no suicidal or homicidal ideation, and poor insight and judgment.  (R. 310.)  His diagnosis was Bipolar Affective Disorder (BAD).  (R. 310). Because he reported side effects from Seroquel it was discontinued. (R. 310.)

On July 20, 2007, Plaintiff returned to Meridian for a medication management

appointment. (R. 307-08.)  Plaintiff had fair appearance, appropriate manner, normal motor behavior, grossly intact cognition, euthymic mood, appropriate affect, no homicidal or suicidal ideation, and poor insight and judgment.  (R. 308.)  Plaintiff's progress was noted as good. (R. 308.)

On September 14, 2007, Plaintiff returned to Meridian for a medication management appointment and a Treatment Plan Reassessment and Update. (R. 303-04, 319-20.)  Plaintiff had good appearance, appropriate manner, normal motor behavior, grossly intact cognition, and mildly paranoid thought process. (R. 304.) Plaintiff was diagnosed with bipolar disorder and his progress was noted as good. (R. 304.)  In the Treatment Plan Reassessment and Update, Plaintiff reported being 100% medication compliant with no significant symptoms or side effects.  (R. 319.)  Plaintiff reported less suicidal thoughts and decreased depression since his last appointment. (R. 319.)  He reported auditory hallucinations but an inability to hear what was being said because the sounds were so low.  (R. 319.)  Plaintiff's wife reported he talks to himself and that he was unaware of this behavior. (R. 319.)  He reported having continued difficulty sleeping.  Plaintiff's GAF score was 60. (R. 319.)

On December 27, 2007, Plaintiff returned to Meridian for a medication management appointment.  (R. 305-06.).  The notes disclose that Plaintiff was stable on medication. (R. 306.)  Plaintiff had fair appearance, appropriate manner, normal motor behavior, grossly intact cognition, stable mood and affect, no homicidal or suicidal ideation, and fair judgment and insight.  (R. 306.)  Plaintiff's progress was noted as a nine out of ten. (R. 306.)  At this appointment, Zyprexa was reduced and Abilify was increased. (R. 306.)

On March 26, 2008, Plaintiff returned to Meridian for a medication management appointment and a Treatment Plan Reassessment and Update. (R. 301-02, 317-18.) The progress notes evidence Plaintiff denied any side effects, suicidal or homicidal ideation, substance abuse, and reported his sleep was good with medications.  (R. 302.)  He reported lacking motivation at times, but had zero mood swings and zero irritability. (R. 302). He had good appearance, appropriate manner, normal motor behavior, grossly intact cognition, mild dysphoric mood, pleasant affect, coherent and relevant thought process, and fair insight and judgment. (R. 302.)  Plaintiff's progress was noted as a seven-eight out of ten. (R. 302.)  Plaintiff reported in the March 28, 2008 Treatment Plan Reassessment and Update positive progress toward goals from previous appointments, 100% medication compliance, decrease in mood swings, no recent auditory hallucinations, manageable depression, and a lack of suicide and homicide ideation. (R. 317.)  The Reassessment and Update evidences Plaintiff's strength in his access to healthcare, his need to continue employment, his ability to make his needs known, his preference to continue treatment, and his challenge of depressed moods. (R. 317.)  Plaintiff's GAF score was reported again to be 60. (R. 317.)

On October 8, 2008, Plaintiff returned to Meridian for a medication management appointment and a Treatment Plan Reassessment and Update. On this visit Plaintiff reported hearing voices in the last two months, more than in the past. (R. 300.). He reported his sleep was good. (R. 300.)  Plaintiff had good appearance, appropriate manner, normal motor behavior, grossly intact cognition, depressed mood, anxious affect, coherent and relevant thought process with auditory hallucinations and paranoia,

no homicide or suicide ideation, and fair insight and judgment. (R. 300.)  Plaintiff's

diagnosis was psychotic disorder, rule out bipolar disorder. (R. 300.)  Plaintiff's progress

was rated at five of ten. (R. 300.)  The Treatment Plan Reassessment and Update

disclose that Plaintiff had made minimal progress toward his goals from his last

appointment. (R. 315.)  Plaintiff reported having zero side effects from medication. (R.

315.)  Plaintiff also reported poor sleeping patterns and poor appetite. (R. 315.)  It was

noted that Plaintiff's hallucinations had reoccurred, although Plaintiff denied suicide or

homicide ideation. (R. 315.)  At this visit, Zyprexa was decreased and Plaintiff began

taking Invega.  (R. 315.)   Plaintiff's diagnosis was psychotic disorder NOS

accompanied by auditory hallucinations, anxiousness and tenseness.  (R. 315.)

Plaintiff's GAF score was 55.  (R. 315.)

On February 6, 2007, Dr. Linda Abeles, a licensed psychologist, clinically

interviewed and administered a mental status evaluation to Plaintiff. (R. 264-66.)  Dr.

Abeles noted that Plaintiff had been diagnosed with bipolar disorder NOS and was

taking Zyprexa and Lithium.  (R. 264.)  However, she stated, "there seems little

evidence for an Axis I disorder."  Plaintiff reported that his mother and father had a

history of mental problems. (R. 264.)  Plaintiff denied learning problems. (R. 264.)  Dr.

Abeles noted Plaintiff had "been the recipient of outpatient mental health treatment

services only and specifically a history of inpatient psychiatric hospitalization is denied."

(R. 265.)  Plaintiff repeatedly denied performing any type of chore due to the effect of

his current medication regime which causes him to sleep excessively.  (R. 265.)  Dr.

Abeles noted that while Plaintiff had a valid driver's license, he could not drive because

of his medications.  (R. 261.)  She found his vision, hearing and gait were all within

acceptable limits.  (R. 261.)  Dr. Abeles noted that Plaintiff exhibited a "lack of effort"

and the evaluation results were, therefore, not considered totally valid. (R. 261.)  Dr.

Abeles concluded Plaintiff's current presentation was consistent with antisocial

personality disorder.  She added that "[c]onsideration might want to be given to referring

the Claimant for an intellectual evaluation with a Spanish-speaking psychologist."  (R.

262.)  She recommended that Plaintiff be referred to the Office of Vocational

Rehabilitation to assist him in obtaining suitable employment.  (R. 262.)  She found

Plaintiff was marginally competent to manage monies in which he may be entitled.

(R.262.)  Dr. Abeles concluded that Plaintiff's future success in the workplace was fair

given his current presentation.  (R. 262.)

On February 6, 2007, Val Bee, Psy. D., completed a mental RFC assessment of

Plaintiff.  Dr. Bee found Plaintiff not significantly limited in his ability to remember

locations and work-like procedures; understand, remember, and carry out very short

and simple instructions; perform activities within a schedule, maintain a regular

attendance, and be punctual within customary tolerances; sustain an ordinary routine

without special supervision; work in coordination with or proximity to others without

being distracted by them; make simple work-related decisions. (R. 263.)  Dr. Bee found

Plaintiff moderately limited in his ability to understand, remember and carry out detailed

instructions; maintain attention and concentration for extended periods; and complete a

normal workday and workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and

length of rest periods. (R. 263.)  She found Plaintiff's social interaction was not

significantly limited and his adaptation was not significantly limited but for Plaintiff's

moderately limited ability to set realistic goals or make plans independently of others. (R. 264.)  Dr. Bee concluded by stating "[m]ood symptoms and medication side effects may hinder detailed learning and cause occasional lapses in concentration and productivity, but claimant appears mentally capable of well structured task activity and at least superficially appropriate social interaction. May benefit from support with suitable goal setting."  (R. 265.)

Dr. Bee also completed a psychiatric review technique form on February 6, 2007. In the PRT, she based the Plaintiff's medical disposition on affective disorders, anxiety related disorders, and personality disorders. (R. 267.)  Dr. Bee noted no episodes of decompensation of extended duration, moderate limitation in maintaining concentration, persistence or pace, and mild limitation in restriction of activities of daily living and maintaining social functioning.  (R. 277.)  Dr. Bee's review of Dr. Abeles' notes reiterates Plaintiff's poor effort, as Plaintiff presented himself as unable to answer basic questions such as the year or the president, as well as his lack of understanding of why people wash clothes.  (R. 279.)  Dr. Bee noted the inconsistency between needing medication to sleep and the inability to do anything but sleep.  (R. 279.)  She noted that an intellectual evaluation was suggested, but educational and vocational history were not consistent with mental retardation. (R. 279.)  Dr. Bee concluded that "[p]ersuasive evidence of a mental impairment that meets or equals listing requirements is not seen at this time."  (R. 279.)

On April 4, 2007, Dr. Gary Buffone, Ph.D., completed a psychiatric review technique form. He found Plaintiff's impairments were not severe.  (R. 281.)  The medical disposition was based on schizophrenic, paranoid and other psychotic

disorders, and personality disorders. (R. 281.)  Dr. Buffone noted that Plaintiff did not have any episodes of decompensation, each of extended duration, and only had mild limitations in restrictions of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace.  (R. 291). Dr. Buffone noted a concern for the "numerous inconsistencies" and concluded that "overall MER suggest mild limitations w[ith] no evidence of a severe mental impairment."  (R. 293.)

On November 25, 2008, Dr. Pait[15] completed a Medical Opinion Regarding Ability to do Work-Related Activities (Mental).  (R. 295-98.).  Dr. Pait stated Plaintiff had poor or no mental abilities and aptitude needed to do unskilled, semiskilled, and skilled work in eighteen out of twenty tasks.  The classification of poor or none means "[n]o useful ability to function in this area."  (R. 295-97.)  The remaining two categories which were assigned a rating of fair (seriously limited but not precluded) were Plaintiff's abilities to maintain regular attendance and punctuality within customary, usually strict tolerance, and sustain an ordinary routine without special supervision.  (R. 296.)  Dr. Pait found Plaintiff had poor or no mental abilities and aptitude needed to maintain socially appropriate behavior; travel in unfamiliar places; and use public transportation. (R. 297.)  He found Plaintiff had fair mental abilities and aptitudes needed to interact with the general public and adhere to basic standards of neatness and cleanliness.  (R. 297.)  Dr. Pait also found Plaintiff could manage benefits in his own best interest.  (R. 298.)  Notably, Dr. Pait did not support his opinions with medical or clinical findings

---

[15]In the initial R&R in Plaintiff's first appeal, Dr. Pait was identified as Dr. Llinas due to an illegible signature on the Assessment.  As noted above, the parties agree that Dr. Pait performed the assessment.

other than to note "Bipolar illness."  (R. 298.)

On September 19, 2012, Dr. Janet K. Humphreys performed a consultative examination.  (R. 612-19).  Plaintiff reported that he was not presently taking any psychotropic medication.  (Tr. 612).  Plaintiff presented a driver's license as proof of identity, and reported that he could drive, but did not own a car.  (Tr. 612).  Plaintiff stated that he had been fired from his job in housekeeping a few months earlier because he had difficulty making it to work.   (Tr. 612).  Plaintiff reported that he was able to shop, cook, and clean his home.   (Tr. 613).  Plaintiff told Dr. Humphreys that he dropped out of school in the twelfth grade because he was tired of studying.  (Tr. 613).  He said that he attended regular classes, but had poor grades.   (Tr. 613).  Dr. Humphreys noted that Plaintiff's mood was anxious; his thought process was logical and goal directed.  (Tr. 613).  Dr. Humphreys administered the WAIS-IV in standard fashion.  Plaintiff was engaged in the task and showed good persistence.  His Verbal Comprehension Index Score was 68; his Perceptual Reasoning Index Score was 73, his Working Memory Index Score was 69, his Processing Speed Index Score was 59, and his Full Scale IQ score was 62.   (Tr. 614).[16]   Dr. Humphreys indicated that Plaintiff's ability to carry out  complex instructions was markedly impaired, and his ability to carry out simple, repetitive tasks was moderately impaired.   (Tr. 617).

### C.  Hearing Testimony

At the time of the January 2009 hearing, Plaintiff was 43 years old and lived with

---

[16]The Full Scale score includes the Working Memory score (69), Processing Speed score (59), Verbal Comprehension Index score (68), and Perceptual Reasoning score (73).  *See id.*

his wife and three children.  He testified that on a typical day when he is not working he locks himself in his room as an alternative to fighting with his family. (R. 33.)  He  could dress himself, but does not always feel like showering, and sometimes needs help with shaving.  (R.38.)  He stated his wife does all the shopping and that he occasionally attends church.  (R. 35.) He occasionally goes to family gatherings but leaves because he is uncomfortable with so many people around. (R. 35.)  He stated he does not do chores around the house because he does not "feel right" to do any chores.  (R. 35.)  Plaintiff further stated that when he locks himself in his room he lies in bed or watches TV.  (R. 36.)  He reported getting only three to four hours of sleep a night because his nerves prevent him from staying asleep.  (R. 35-36.)  Plaintiff reported that his medications helped, but "not too much."  (R. 34.)  Plaintiff testified that he did not think he would be able to do his part-time pressing job full-time because he already feels like not going to work. (R. 37.).   Plaintiff explained he did not feel he could work more than four hours in his current job.  (R.37.)  Additionally, Plaintiff reported difficulties performing his current job.  For example, he could not always remember how to assemble the shirt in order to iron it and he also argued with his co-workers and the owner.  (R. 37.)  He reported losing many jobs in the past for arguing.  (R. 37.)  Plaintiff stated that he has not been fired from his current job because his brother is a friend of the owner and the owner knows about Plaintiff's condition. (R. 39).

At the August 2012 hearing following the remand, the ALJ and Plaintiff's counsel discussed that Plaintiff's earnings record reflected a history of earnings at or near the substantial gainful activity level for some years.  Plaintiff testified that he last worked for eight or nine weeks ending in May 2012 as a housekeeper at Homewood Suites.  He

was frequently absent because he was depressed and did not feel like going to work. (R. 364, 369.)  Prior to that he worked as a laundry presser at On the Spot Dry Cleaning.  Plaintiff also had previous jobs as a machine operator, as a receiving clerk, and in manufacturing as a gluer/cementer.  The VE testified that Plaintiff's various jobs fell within the unskilled (presser), semi-skilled (machine helper), and low end of skilled (receiving clerk).  (R. 374-75.)

Plaintiff testified that he was not receiving psychological treatment because he did not have Medicaid.  Plaintiff testified that he sometimes has trouble remembering things, and does not have a problem being around crowds of people.  He and his wife take turns cooking and doing laundry.  (R. 367-68.)  Plaintiff testified that he shops for groceries, and that both he and his wife do the housework.  He testified that he attends church twice a week.  (R. 368.)  Plaintiff's counsel stated that she believed if Plaintiff received consistent mental health treatment then it would not "be a long-term case."  (R. 369.)

The ALJ observed that Plaintiff had "worked steady for a long time," and asked Plaintiff what changed in 2006.  Plaintiff responded that he started feeling depression. He was tearful and did not want to interact with anyone.  (R. 370.)   Plaintiff testified that he had difficulty concentrating and focusing in loud environments.

A VE testified that a person such as plaintiff with no exertional limitations and the nonexertional limitations of simple routine tasks with up to three-step commands, occasional changes in work setting, occasional judgment and occasional decisionmaking, with occasional interaction with the public and coworkers would be capable of performing Plaintiff's past jobs of gluer and presser.

After Plaintiff's examination by Dr. Humphrey's, another hearing was convened on May 28, 2013; Plaintiff participated by telephone.  Plaintiff's counsel contended that Plaintiff's mental health problems fell under listing 12.05C.  The ALJ observed that Plaintiff's full scale IQ score was within the listing, and inquired whether Plaintiff had deficits in adaptive functioning prior to age 22.  Counsel contended that Plaintiff's poor grades during his school years was an indicator of adaptive deficits.  Counsel conceded that the issue of adaptive deficits was a "judgment call" for the ALJ.  (R. 352-53.)

## IV.  DISCUSSION

Plaintiff argues that the ALJ erred at step three by not finding that he met the requirements of Listing 12.05B based on his Processing Speed Index Score of 59 with deficits in adaptive functioning, or alternatively for 12.05C based on his Full Scale IQ score of 62 with deficits in adaptive functioning and additional mental impairments of bipolar disorder and psychotic disorder.  Doc. 21.  However, Plaintiff does not have the requisite adaptive deficits to meet the requirements of the listing and therefore the ALJ's decision is due to be affirmed.

The listing for mental retardation in Listing 12.05 requires that the claimant's impairment "satisf[y] the diagnostic description in the introductory paragraph" *and* any one of the four sets of criteria that follow it.[17]  The diagnostic description states that an individual is mentally retarded if they have a "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the

---

[17]  20 C.F.R. Part 404, App. 1, Subpart P, 12.00A, ¶ 4.  Where adults have not had intelligence testing prior to age 18, a diagnosis of mental retardation satisfying the diagnostic requirement of this Listing could be inferred from the plaintiff's history and current functioning.  Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,753 (Aug. 21, 2000) (to be codified at 20 CFR Parts 404 and 416).

developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22."[18]   Subaverage general intellectual functioning refers to an IQ of about 70 or below on various standardized intelligence tests.[19]

Listing 12.05B requires that the claimant have a "valid verbal, performance, or full scale IQ of 59 or less."  Listing 12.05C requires that the claimant have a "valid verbal, performance, or full scale IQ of 60 through 70 <u>and</u> a physical or other mental impairment imposing an additional and significant work-related limitation or function."[20]

Plaintiff first asserts that his score of 59 on the subtest for Processing Speed brings him within listing 12.05B.  As the Commissioner contends, and as Plaintiff concedes in his brief, in the newest version of the Wechsler Adult Intelligence Scale (WAIS-IV), the term Verbal IQ has been replaced with the term Verbal Comprehension Index, and the term Performance IQ has been replaced with the term Perceptual Reasoning Index.  *See* Doc. 21 at 2.  The Social Security regulations provide that "in cases where more than one IQ is customarily derived from the test administered, *e.g.*, where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these [three] in conjunction with 12.05."   20 C.F.R., Pt. 404, Subpt. P, App. 1 at § 12.00 (C)(6) (c).  Plaintiff's Verbal Comprehension Index Score was 68, his Perceptual Reasoning Index Score was 73, and his Full Scale IQ Score was 62.

---

[18]   <u>Crayton v. Callahan</u>, 120 F.3d 1217, 1219 (11th Cir. 1997) (finding that at the very least, to be considered for disability benefits under Listing 12.05, the claimant must meet all parts of the diagnostic definition in the introductory paragraph: "(1) significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." Once these three elements have been established, the court looks to paragraphs A ,B, C, and D to assess the severity of Plaintiff's mental retardation and its impairment on plaintiff's ability to work.

[19] <u>DSM-IV</u> at 42.

[20]   20 C.F.R. Part 404, App. 1, Subpart P, 12.05C.

Plaintiff's Processing Speed Index Score of 59 is not one of the individual IQ

measurements recognized in the regulations.  *See id*.

The IQ testing conducted by Dr. Humphrey reflects that Plaintiff's full-scale IQ

score was 62, within the range under listing 12.05C.  However, IQ alone is not enough

to determine mental retardation because "[i]mpairments in adaptive functioning, rather

than low IQ, are usually the presenting symptoms in individuals with Mental

Retardation."[21]  While the IQ often remains stable, adaptive functioning can improve

with training,[22] and therefore a valid IQ score is not enough to determine if someone is

mentally retarded.[23]  Accordingly, the primary issue, as the ALJ recognized, is whether

Plaintiff has the requisite deficits in adaptive functioning to meet the requirements of

Listings 12.05B and 12.05C.

In the instant case, the ALJ's conclusion that Plaintiff does not meet the

requirements of Listing 12.05B or 12.05C is supported by substantial evidence.

Specifically, despite Plaintiff's low IQ scores, he does not meet Listing 12.05B or

12.05C because the evidence does not show the required deficits in adaptive

functioning.  The medical evidence and Plaintiff's history of work activities support the

ALJ's finding.

With respect to Listing 12.05B, the ALJ concluded that despite his Processing

---

[21] DSM-IV at 42.

[22] Id.

[23] "Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there
are no significant deficits or impairments in adaptive functioning."  See Lowery v. Sullivan, 979 F.2d 835,
837(11th Cir. 1992) ("[A] valid IQ score need not be conclusive of mental retardation where the I.Q. score
is inconsistent with the other evidence in the record on the claimant's daily activities and behavior.") (citing
Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986)).

Speed score of 59, Plaintiff's work history reveals adaptive functioning at or above borderline IQ levels.  In particular, Plaintiff's earnings record reflected that he had earned well above substantial gainful activity for many years, performing some jobs at the skilled and semi-skilled level.  There was nothing in the record that indicated that Plaintiff had suffered an injury which would cause his cognitive functioning to decline after performing such work.  *Id*.

In the same vein, the ALJ concluded that the criteria of 12.05C were not met because although Plaintiff had a full scale IQ score of 62, he did not have deficits of adaptive functioning consistent with mental retardation.  The ALJ again noted Plaintiff's earnings records, which showed that he was able to earn above substantial gainful activity for several years.  (R. 335.)  Plaintiff "was able to learn the skills to perform these jobs and he did not report difficulties doing so."  The ALJ observed that prior to the recent IQ testing, Plaintiff had never alleged "an inability to work due to decreased intellectual functioning."  *Id*.   Further, Plaintiff's educational background and daily activities as described in the most recent hearing testimony support a conclusion that he did not have deficits of adaptive functioning.  Plaintiff attended school to twelfth grade, but left three months prior to graduation.  He testified that he attended mainstream classes.  He has a driver's license.  Plaintiff testified that he and his wife take turns cooking and doing laundry, that he shops for groceries, that both he and his wife do the housework, and that he attends church twice a week.  (R. 363-71.)

In sum, substantial evidence supports the ALJ's conclusion that Plaintiff was not disabled pursuant to Listing 12.05B or 12.05C because the record did not demonstrate that Plaintiff has deficits in adaptive functioning.

# V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of

the Commissioner should be **AFFIRMED.**

**IN CHAMBERS** in Gainesville, Florida, this 6th day of February 2015.


*s / Gary R. Jones*

GARY R. JONES
United States Magistrate Judge


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**